Johnson, Chancellor.
The said cause standing ready for hearing, and being submitted, the bill, exhibits, answers, and all other proceedings, were by the Chancellor read and considered. And the claim of the complainant, as stated in the bill, being established to the Chancellor’s satisfaction, and it appearing, that the deceased Stephen Scotton did not leave personal estate sufficient for the payment of his just debts,
It is thereupon Decreed, that the real estate of the said Stephen Scotton in the bill of complaint mentioned, or so much thereof as shall be necessary, be sold for the payment of the costs of this suit, of the claim of the complainants, and of such other debts of the deceased as shall be established to the Chancellor’s satisfaction. And it is further Decreed, that Ashur Foulke be, and he is hereby appointed trustee for making sale as aforesaid, &c. He shall then proceed to sell the said tract of land in the proceedings mentioned, either entire, or in parcels as he shall think fit, upon the following terms, to wit: one-third part of the purchase money to be paid at the time of sale, or on the ratification thereof by the Chancellor; one other third part of the purchase money to be paid in twelve months from the day of sale, and the remaining third part to be paid in two years from the day of sale; for the payment *631 of the two last instalments with interest, notes or bonds with security, to be approved of by the trustee, shall be given, &c.
Under this decree, the trustee Foulke on the 29th of August made a report, in which he says, that ‘after having given bond and advertising the terms of the sale in two public papers agreeably to the directions of said decree, a public sale was held on the 23d day of July, when there was no more bid than $8 per acre, which was not thought sufficient to authorize a sale; and have since sold it on the 28th day of August, 1822, as may be made appear, for $11 per acre; the land supposed to contain one hundred and forty acres.’ Upon which an order was passed on the same day, that the sale be ratified on the 10th of November following, unless cause shewn to the contrary, &c.
Samuel Anderson on the 9th of October, 1822, filed his petition, in which he states, that he contracted with the trustee Foulke for the purchase of the land called Duvall’s Delight, supposed to contain one hundred and forty acres, at the sum of $11 per acre; and by the trustee’s report was returned as the purchaser; that the trustee represented a piece of woodland on the north side of the tract as a part of it; that Anderson had since been credibly informed, and believed, that the lines of several neighbouring tracts ran into and took off the greater part of the woodland; that the location of the woodland was the principal inducement to his purchasing the tract; and is material and necessary to the possession and enjoyment of it. Upon which he prayed, that the sale as made and reported might not be ratified.
9th November, 1822.
Johnson, Chancellor.
The within petition will be heard on the 30th instant; provided a copy thereof, and of this order, be served on the said Ashur Foulke before the 16th instant. It is further Ordered, that depositions taken before any justice of the peace on three days’ notice thereof to the parties, or their solicitors, be read and received as evidence at the hearing.
To this petition of Anderson’s the trustee Foulke, on the 4th of December, 1822, put in his answer, on affirmation, in which he avers, that he never shewed or made any representation to Anderson as to the lines of that part of the tract called Duvall’s Delight, which he had sold to him; that he knew the lines at the time he made the purchase, they having been shewn to him by the sur *632 veyor who was then engaged in running out an adjoining tract; that Anderson voluntarily, without any misrepresentation by the trustee, had executed the written contract under his hand and seal, of which the following is a true copy:
‘Memorandum of a bargain made and concluded upon the 28th day of August, A. D. 1822, between Ashur Foulke, trustee appointed to sell the estate of Stephen Scotton, deceased, of the one part, and Samuel Anderson, of Anne Arundel county, of the other part, witnesseth, that the said Ashur Foulke hath sold to the said Samuel Anderson, his heirs and assigns, all that tract of land, late the property of said S. Scotton, deceased, as aforesaid, supposed to contain one hundred and forty acres, be it more or less, at $11 per acre, he, the said Samuel Anderson, is to pay one-third of the purchase money down, and the remainder in two equal annual instalments, with interest; for which, notes are to be- given, with approved security; and when paid, the said Ashur Foulke is to make and execute a title or deed, to him the said Samuel Anderson, his heirs and assigns for ever.’
The time for hearing this matter, with the leave to take testimony, was, by an order of the 26th of November, 1822, extended to the second day of January following. After which, the case was again brought before the court, and on motion,
8th January, 1823.
Johnson, Chancellor.—
Ordered, that the surveyor of Anne Arundel county, lay down any land that may be directed by either of the parties, for the better illustration of the matter in controversy; and to ascertain the land and the quantity thereof, that was sold by the trustee. And that depositions be taken on the survey, that either of the parties may direct.
Under this order the surveyor laid down the lands as directed, and on the 19th of March, returned a plot and certificate of the surveys he had made; and the parties having filed sundry depositions taken under the previous order, the matter was brought on for hearing.
17th April, 1823.
Johnson, Chancellor.
It is alleged by the petitioner, that Ashur Foulke, the trustee, under a decree for the sale of the real estate of Stephen Scotton, sold to the petitioner, part of a tract of land called Duvall’s Delight, supposed to contain one hundred and forty acres, at $11 per acre; that at the time of the sale, the trustee represented a piece of woodland, on the north side of the said tract of land, as part of the said tract called Du- *633 Tail’s Delight; that he believes, that the lines of the several neighbouring tracts of land, run into and take off a great part of the woodland; and that the woodland was the principal inducement to his purchasing. As the property did not, according to the allegations contained in the petition', correspond with the representation made by the trustee, it is prayed that the sale may be set aside or annulled.
Preparatory to a decision, an order passed for laying down the land that was sold, ap well as any other land that might be deemed by the parties necessary for the illustration of the matter in coiitroversy.
On examining the plot returned by the surveyor, it appears, that the trustee has laid down the land which he sold to the petitioner, and this location is not counter-located; and therefore, admitted to be the land purchased. The quantity is one hundred and forty-one and three-quarter acres, of which, three roods are within the lines of a deed executed by Charles Carroll to Humphrey Hogan, on the 16th of July, 1723.
It seems to appear, that Charles Carroll was the owner of the whole of the tract of land, which was conveyed by him to different persons; and before it can be known whether the three roods are the property of those claiming under Hogan, or belonging to the estate of Scotton, it is necessary to see the other transfers; and if Hogan's title is the eldest, yet a title to it may have been acquired by possession; for as it is laid down as a part of the land sold, it is to be presumed, Scotton was in possession at the time of his death.
Where a tract of land is sold, and it turns out to be materially varient from the representation, the contract may be set aside. Where a tract is sold as containing a given quantity of acres, when it is discovered that less is included than was conceived at the time of the sale, a deduction will be made, unless the deficiency shall be such as would have prevented the contract, if known at the time of the purchase; that is, the deficiency appearing to be in that part which was the chief inducement to the purchase. But in this case, in every respect, the petitioner has failed to support his allegations. He has not proved that the trustee represented to him, that he sold a piece of woodland, as part of Duvall’s Delight, which is included in the lines of neighbouring tracts. He has laid down no interfering tract whatever; nor if the right of the trustee to sell three roods, did not exist, and it could not exist unless it was *634 owned by Scotton at the time of his death, has he proved that those roods of land were the inducement to the purchase. The sale made by the trustee, is therefore, ratified and confirmed, and the petition dismissed with costs.
From this order, Anderson appealed; and no objection being made, the Court of Appeals, on the 16th of July, 1825, affirmed the Chancellor’s order.
After which, the trustee Foulke, by his petition, on affirmation filed on the 12th of January, 1826, stated, that he had served a copy of the decision of the Court of Appeals, on Anderson, and had demanded of him payment, and that he should complete his purchase, which he had refused to do. Whereupon, the trustee prayed for an attachment.
Upon which, on the next day, an attachment was ordered as prayed, returnable to the first day of March term then next. The writ was issued accordingly, and Anderson having been brought before the court under it, the trustee prayed that he might be committed.
But Anderson had previously, on the 16th of March, 1826, put in his answer on oath, in which he alleged that it did not appear, by the trustee’s report, that he, Anderson, was the purchaser of the land ; that in consequence of the irregularity of the proceedings, a good title could not be conveyed to him by the trustee; that he, Anderson, had not been put into possession of the land, and he believed that the trustee could not give him the possession, the land being in the occupation of a certain Joseph Marriott; that a copy of the decretal order of the Court of Appeals had not been served on him, Anderson; that he was unable to comply with the terms of the decree, and that the Court of Chancery had no power to give the relief asked for by the trustee.
Ylth March, 1826.
Bland, Chancellor.
The petition of Foulke, the trustee, with the answer thereto of Anderson, the purchaser, standing ready for hearing, and the solicitors of the parties having been heard, the proceedings were read and considered.
It does not sufficiently appear that Anderson has ever been called upon, under any order of this court commanding him to pay to the trustee, or bring into this court the sum of money which he contracted to pay for the land sold to him, as mentioned in the proceedings; therefore, without intimating any opinion as to any other matter urged or suggested by the counsel on either side, the *635 Chancellor conceives that Anderson must be discharged from his present detention.
Whereupon it is Ordered, that Samuel Anderson be, and he is hereby discharged, without costs, from any further detention under the attachment by virtue whereof he has been brought before this court.
And it is further Ordered, that the said Samuel Anderson pay unto the said Ashwr Foullce, the trustee, or bring into this court the sum of $1,540, with interest thereon from the 28th day of August, 1822, until paid or brought in, being the amount of the purchase money of the land sold to him, as in the proceedings mentioned, on the 17th day of April next, or shew good cause to the contrary. Provided that a copy of this order, together with a copy of the said petition of Foulke, filed on the 12th of January last, be served on the said Anderson on or before the 25th instant.
By the answer of Anderson, on oath, filed on the 28th of March, 1826, shewing cause against this order, he states that the trustee, as appeared by the agreement of the 28th of August, 1822, undertook to make an absolute sale of the land, in violation of the decree, by which any sale to be made by him required the confirmation of the Chancellor; that he, Anderson, was not returned as the purchaser by the report of the trustee; that the quantity of the land was not ascertained by the trustee’s report; that the land shewn to Anderson as the property to which the trustee could give title differed materially from that which the trustee was authorized to sell; that Anderson gave no bond or note for the payment of the purchase money; nor has any been asked of him as -was required by the decree; that he had never obtained possession of the land, and believed that he could not obtain possession, it being in the occupation of a certain Joseph Marriott; that he, Anderson, was unable to comply with the terms of the sale, and that he could not, in equity, be compelled to execute the contract; or, if the trustee thought otherwise, he should file his bill in equity, or sue at law for the purchase money, when the whole case might be fully investigated, the rights of the parties conclusively established, and complete justice done to both.
By consent of parties, it was Ordered, on the 17th of April, 1826, that the matter stand for hearing on the first Wednesday of May then next.
12th May, 1826.
Bland, Chancellor.
This matter standing *636 ready for hearing, and the solicitors of the parties having been fully heard, the proceedings were read and considered.
This application has been assailed as a novelty, altogether without precedent here, and having few even of English origin, and those few of very late date, and long since our revolution. It has also been opposed upon the ground that the parties interested can only obtain redress, if, indeed, they are really entitled to any, by a bill in equity or a suit at law; in which, as it is said, the whole case can be fully investigated, the rights of the parties conclusively established, and complete justice done to both.
The defence taken in this case, if sustainable in all its consequences, appears to be destructive of some of the most valuable and important powers of this court. Controverted points, arising between the court’s trustee for the sale of property and the purchaser have frequently been brought before me, since I came here; but in each instance they have been treated as insulated matters of mere practice, and have passed off in that way. This case has assumed a more grave aspect. I shall, therefore, now review the subject more at large, and upon general principles.
On considering the nature of sales under the authority of the Court of Chancery, the first inquiry which suggests itself is, who are the real parties to the contract ? This very idea of a contract, implies that there is one party able and willing to contract, and another to be contracted with. It implies a perfect capacity and free will, in each of the parties to the agreement. To a contract of sale, made under a decree of this court, neither of the litigating parties can be considered as the vendor; although they, with others, such as creditors, who may be allowed to come in after-wards, may be very materially interested in the sale. The plaintiff cannot be considered as the vendor; because, oftener than otherwise, he has no title, always states his inability to sell, and prays the court to decree that a sale be made. The defendant cannot be the vendor; because he always positively refuses to part with his property, unless forced, or sanctioned in doing so by the power of the court. If then, neither of the litigating parties can be separately deemed to be the vendor, it is clear, that they cannot both together, be so considered.
But such sales are always made by an agent; in England, by a master, in this state, by a trustee. Private contracts may be made and executed in person, or by attorney; but the attorney is never considered as one of the contracting parties, he exercises no will *637 or power of his own, he is merely the medium or conduit through which the will of the contracting party is expressed. The master or trustee is the mere attorney of the court, acting under a specially delegated authority, (a) And, in no case, is a master or trustee authorized to do more than to accept an offer or proposal to contract, which is of no sort of validity unless it be accepted, ratified and confirmed by the court. It is the court itself, for the benefit of all interested, therefore, who is the vendor in such cases.
But it may be said, if the court be the vendor in sales made by its trustee, would it not follow, for the same reasons, that a court of common law must be considered as the vendor in sales made under its writ of fieri facias by the sheriff? The cases are essentially different. The writ of fieri facias is a general authority or command to the sheriff to make so much money by sale from the personal estate of the defendant. By this writ the executive officer of the court is commissioned to seize the whole, any part, or so much of the defendant’s personal estate as may be necessary to raise the specified sum of money. No particular articles of property are ever designated. By statute, (b) this power, given by the common law writ over personal estate, has been extended over real estate. And the same writ, and nearly the same principles of law, now apply to both species of property.
The real or personal estate with which the Court of Chancery deals is, however, always in one form or other distinctly specified in the proceedings; and the sale is made only because the court is asked to have it made to accomplish the objects of the suit. In the proceedings at common law, from the commencement to the fieri facias, no property is designated. At common law, the terms and manner of sale are regulated by law; in chancery, they are regulated by the court. At common law if the sheriff, in seizing the property and making the sale, conforms to the established regulations applicable to all cases, (and he can sell in no other manner,) the sale is final and valid as soon as it is made. But in chancery the sale is, in no case, binding and conclusive, until it has been expressly approved and ratified by the court. If it be made in a manner wholly different from that prescribed by the court, it may yet be sanctioned; or, if it be made in all respects conformable to directions, it may still be rejected. And hence, it is obvious, that *638 in the one case it is the Court of Chancery who is the real vendor, and in the other, the sheriff or executive officer of the court.
In an English case which arose on a sale under the authority of the Court of Chancery, decided in the year 1721, in which the question was, whether the purchaser should be compelled to complete his purchase or not, the matter is spoken of as one perfectly settled. ‘Upon a contract betwixt party and party,’ says the Chancellor, ‘the contractor would not be decreed to pay an unreasonable price for an estate; so neither ought the court to be partial to itself, and to do more upon a contract made with itself, or carry that farther, than it would a contract betwixt party and party. On the other hand, the court might be said to have rather a greater power over a contract made with itself, than with any other.’ (c) And in other cases of recent date, where the subject has been brought into view, the court has, in like manner, been spoken of and considered as the vendor, (d)
In a controversy relative to a, trustee’s sale under a decree of this court, which was frequently brought before Chancellor Hanson, and appears to have been much considered by him, he says, ‘with respect to sales under the authority of this court, the Chancellor thinks himself bound to act as if the property were his own, or held by him in trust. That is to say, he thinks, that reasons which would induce him as proprietor or trustee to set aside a sale made by his agent, should determine him as Chancellor to refuse his approbation to a sale made by a trustee.’ (e) Hence it is evident, *639 that he considered the bidder or purchaser as a contracting party, on the one side, dealing with the court as the contracting party on *640 the other, and who was, in fact, the vendor. That the court was to be considered as the proprietor and principal, and the trustee as *641 the mere agent, having no right or power whatever, other than as a mere attorney. Hence it is clear upon principle, and also upon *642 authority, as well in this state as in England, that the Court of Chancery, and not its trustee, is in all cases to be considered as the party contracting, or as the real vendor.' (f)
The manner of sending property into the market, as well as the mode of sale, generally adopted in this state, differs, perhaps, in some particulars, from that of other countries, (g) The form of ordinary sales of merchandise by auction is the same in this state as in England. But the mode of making a sale of property under the authority of the Court of Chancery in England is different. *643 In such case, the estate is sold before one of the masters in chancery, who, after the particulars of sale are prepared, corrects and sanctions it by his signature, to authorize the insertion of the advertisement in the Gazette. After which the master, with the approbation of the parties, fixes a time of sale; and the second advertisement, for there are always two, is then inserted in the Gazette, stating the time of sale. On the day of sale a particular of the property, or lots to be sold, is prepared under the authority of the master. The property or lots successively are put up at a price offered by a person present, and every bidder must sign his name, and the sum he offers, in the space on the particular under the lot for which he bids. The best bidder is, of course, declared to be the purchaser; the biddings are closed, and he is reported as such by the master, to the court; and if the sale be ratified, the contract is complete. (h)
In this state the manner and terms of sale are particularly prescribed in the decree; and the trustee is directed to conform thereto. The sale may be directed to be either private or public. If the latter, it is conducted in the form of an ordinary auction; the bids are received verbally, and the highest bidder is reported as the purchaser by the trustee.
All the several forms of sale are, however, mere modal regulations ; each of them has its advantages and inconveniences; but none of them can, in any way, materially affect the parties to the contract, or its terms, nature, or obligatory force. The English Court of Chancery will not suffer the property to be sold in any manner different from that prescribed, (i) In this state these modal regulations are not regarded as of so much importance; and axe therefore not so strictly adhered to. If a trustee, who is directed by the decree to sell the tract of land entire, and at public sale, should sell it at private sale and in parcels, or in any other manner different from the mode prescribed, and report satisfactory reasons for doing so, and no objection is made, the sale may be ratified.
But whatever variety or difference may exist as to the mere modality of sale, the intentions and general objects are the same every where and in all cases. The benefit of the interested parties, for whom the court makes the sale, is always and chiefly regarded. The highest price that can be had, under all circum *644 stances, should be obtained; and the sale should be in all respects a fair and honest one. These are the ends in view. To attain them, in England, if after, the biddings are closed, any one else comes in and offers a much higher price, the biddings may be opened, and the additional offer accepted. This phrase of ‘opening the biddings,5 which, in the English books, occurs so frequently, means no more than a further suspension of the sale, and a continuance of the property in the market, (j) In this state, there has been no instance of opening the biddings or suspending the sale merely to let in another and a higher bid, and. for no other cause. But in this state, as well as in England, if there should be made to áppear, either before or after the sale has been ratified, any injurious mistake, misrepresentation or fraud, the biddings may be opened, the reported sale rejected, or the order of ratification rescinded, and the property again sent.into the market and re-sold.
As to sales under the authority of this court, it has long been well established, that any circumstance shewing that the sale was injurious, to the parties concerned, or that a better sale might rea-' sonably and probably have been made, is sufficient to prevent a ratification. It is not incumbent on the party objecting to shew favouritism, or "an improper motive, although such proof would furnish conclusive inducement for‘rejecting the proposed sale. But where, the property of infants was to be sold, even a strong doubt of the propriety of the sale has beén deemed sufficient to prevent its ratification. And if, in any case, the trustee reports, that there was an error, mistake, misunderstanding, or misrepresentation as to the terms or manner of the sale, it may be at.once rejected, and a re-sale ordered without further, inquiry. Objections are seldom or .ever made by any others than those directly interested; ■ But the court, in acting as proprietor, or as if the property were its own, and in [ deciding on the merits of a sale, will' avail itself of information from every quarter from which it may be derived; that is, from the original parties to the suit, or the creditors for whose satisfaction the sale is to be made, or from any other person. In such cases, however, much more attention will be paid to objections coming from those who are interested than from volunteers. But it is not unusual, with the consent of all parties interested, to ratify the sale immediately on its being reported, without giving any notice or time for objections to be made by others,.
*645 Where land has been sold, under the authority of this court, by the tract or in parcels, containing so many acres, ‘more or less,’ the sale will not be rejected, unless the deficiency, should it be objected to on that account, be material and considerable. It has been established as the law of the land office, by the proprietary’s instructions, as far back as the year 1684, that the words ‘more or less,’ in every patent grant, shall be taken to amount to ten per cent, over or under, and no more, (k) But in this court, and in relation to private contracts, or to sales under a decree, the words ‘more or less,’ added to the statement of the quantity, has never yet been fixed by any decision. (l) Each case appears to have been governed by its own peculiar circumstances. Where the deficiency was material in that part which was the inducement to the purchase, or the like, the sale has been set aside, (m) But where the deficiency has-been such as not materially to vary the contract, and the purchaser was still willing to purchase, a proportionable deduction has been made. But where land is sold, not by the tract or in a body, but by the acre, or in lots, at so much per acre; and the alleged number of acres, or the location and description of the lots should not be known or admitted, a survey, when called for, may be ordered as of course; by which all uncertainty as to the quantity and location of the land, and the amount of the purchase money may be entirely removed, (n)
*646 In England, it would seem to be usual, in sales under the authority of the court, to offer a good title to the bidders; and hence the references to a master, at the instance of a party or of purchaser, of which we read so often, to ascertain whether a good title can be made or not. (o) , But in this state it has been always the established law of the court, to sell all the right and title of the parties to the suit, whatever that may be, and nothing more-To all judicial sales under orders or decrees of this court, the rule caveat emptor has been applied. And consequently no examination into the title, after the sale, is necessary, or can be called for *647 by tbe purchaser, whatever may he either its patent or latent defects. (p) But if the trustee makes any promise or representation to the bidder, before the sale, that the estate shall be, or is clear of .all incumbrances, or that the title is better or different from that to be traced from the proceedings, and any such claims should afterwards appear, or be set up, the sale will be annulled. But this relief would be granted to the purchaser on the ground of misrepresentation or fraud, and not on that of a mere defect of title, as in cases between party and party.
After a sale has been ratified, the court, in England, will not rescind the order, and open the biddings without strong inducements. (q) So in this state, after a sale has been made and reported, and before it has been ratified, it is open to all objections. And, if objected to, unless it should, on examination, turn out to be, in all ¡respects, fair and proper, it will not be ratified. But, after it has been confirmed, the purchaser can only obtain relief by bill or petition; and thus calling the litigating parties to the suit again before the court to answer, repel, and remove the objections which he may so make, if they can.
*648 It is usual, in England, at the time of bidding, or of having the biddings opened to be let in as a higher bidder, for the proíféring purchaser to make a deposite of a considerable amount of the purchase money, by way of earnest. And this deposite is sometimes said to be the only hold which the court has upon the purchaser; and it is in truth, the only hold which it can have of him in that stage of the proceedings; for he cannot be quickened before the report is confirmed absolutely, (r) And should he turn out to be insolvent, it is the only effectual hold the court will ever be able to take of him. Consequently, the exacting of a deposite from the purchaser is there considered as a useful and proper precaution. (s) If the purchaser refuses to comply with his contract; the court will, if required by a party interested, inquire whether he is able to pay; and if it should appear that he is insolvent, or has not the means of complying with his contract, the sale will be annulled, the deposite forfeited, and a re-sale ordered. For, even at common law, and between party and party, if, after being requested, the vendee does not, within a convenient time, come and pay for, and take away the goods purchased, the agreement will be dissolved, and the vendor at liberty to sell them again to any other person, (t) If, however, the purchaser is able, and fails to comply, the court will not suffer itself to be baffled, but will, at the instance of a parfy interested, compel the purchaser to comply by process of attachment for contempt.
The exercise of a similar summary power of coercion by this court against a tardy or unwilling purchaser, after the confirmation of the sale, it has been repeatedly and strongly urged, is one which is not within the scope of its jurisdiction. The exercise of such an authority, it has been urged, is a very reeent and equivocal extension of the power of the Court of Chancery in England. It has sometimes happened that a necessary and important power, after having been called into action, and produced alhthe beneficial effects required or expected, is suffered to slumber so long as to drop almost into oblivion. Such, it would seem, has been, in some degree, the fate, both in England and in this state, of this power of coercing a purchaser under a decree, to comply with his purchase.
In the year 1721 the Court of Chancery of England was pressed *649 by a party interested to force a purchaser under a decree to complete his purchase, and not to let him off by a mere forfeiture of his deposite, although it amounted to nearly one-tenth part of the purchase .money. It was not even intimated that the court had not the power to do so. But it would seem that, in that case, the purchase was made at a time when the nation was under a general delusion as to the quantity of money in circulation, and the value of property, and the purchaser had been thus induced to give an unreasonably high price for the property in question. The Chancellor, without expressing the least doubt as to his power to use coercion in a summary way against the purchaser, or saying any thing distinctly upon the point, said that it was punishment enough if the purchaser was made to lose his deposite, and satisfaction enough to the seller if he was to have the benefit of keeping it. (u) Hence it may be inferred that the court considered itself as having the power to proceed against the purchaser, but that it did not think proper to do so in that case.
One of the most accurate of the English reporters, gives us the following, as the words of Lord Hardioiclce, delivered in the year 1748, in relation to this subject: ‘the present,’ says he, ‘is a judicial sale of the estate, which takes it entirely out of the statute, (of frauds.) The order of the court was not interlocutory, but made part of the decree; as it always is on the matter reserved, though made at another day; and it includes as well the carrying the purchase into execution, as the establishment of the charity; amounting to a decree for the conveyance of the estate on one side, and payment of the money on the other; who might be prosecuted for a contempt in not obeying that order. And it is stronger than the common case of purchasers before the master, who are certainly out of the statute; nor should I doubt the carrying into execution against the representative, a purchase by a bidder before the master, without subscribing, after confirmation of the master’s report, that he was the best purchaser; the judgment of the court taking it out of the statute. But even in common cases, this question may arise; as if the authority of an agent, who subscribed for the bidder, not being admitted, cannot be proved. Yet, if the master’s report could be confirmed, it should be carried into execution, unless some fraud; for this is all exclusive of any defence that may still be set up on the other side.’ (w)
*650 In this case, the testator had bequeathed a certain sum of money to be invested for charitable purposes, and on a reference to the master to propose a scheme of investment, he had reported, that the money should be laid out in the purchase of certain lands. The report had been confirmed, and the object then was, to obtain a specific performance of the order confirming the master’s report. As to which point, Lord Hardwicke is reported to have said, ‘the material consideration is, whether, as circumstances now stand, considering the events and alteration of rights thereby, the court ought to carry it into execution ? The general rule certainly is, that this is discretionary in the court, but will not hold in the present ; for that is generally in cases, where there may be an election of two remedies, by coming here for a specific performance, or by action at law; whereas, here, there can be no remedy at law; all arising under the acts of this court, from that order amounting to a decree. So, that if this court does not carry it into execution, it cannot be at all; yet, whether other remedy or not, if there are strong and material objections against it, the court ought not to do it.’
Hence, it appears to have been the decided opinion of Lord Hardwicke, long before our revolution, not only that a purchaser, after the sale had been ratified, might be compelled to pay the purchase money by process of attachment for contempt; but that there was, in fact, no other remedy; since it is clear, that no action at common law, could be maintained against the purchaser, grounded merely on the order in chancery confirming the sale. And this was cited by Lord Eldon, in 1805, with approbation, as being entirely sound in its principles. (x)
A doubt was expressed upon this subject, in a case on the equity side of the Court of Exchequer, in the year 1793, when, on the court’s being referred to a similar proceeding in chancery, which had taken place in the year 1787, an order was made, after the confirmation of the sale, that the purchaser should be compelled to complete his purchase. (y) But in the year 1808, the instances in which the Court of Chancery had exercised such a power, seems to have been again almost forgotten. (z) The Chancellor expressed *651 some doubt, but on being referred to a case which arose in the year 1791, he made the order, that the purchaser should pay his purchase money within a fortnight, or stand committed; observing, that the principle required it equally in the case of a purchaser, who could not be permitted to baffle the court, and disobey an order, more than any other person, (a)
From these authorities it appears to have been the settled law of the English Court of Chancery long before, and ever since our revolution, that on a purchasers failing to comply, the court would, on application, after the ratification of the sale, compel him to complete his purchase by process of attachment for contempt.
But it has happened in this state as in England, that the' evidence of the existence of this power, so important and so necessary to the jurisdiction of the Court of Chaneery, has been many times almost forgotten, and the propriety of the power itself has been as often doubted or opposed. (b) There is no instance in this state of a deposite ever having been exacted of a bidder, before the ratification of the sale; and therefore, if a purchaser cannot be coerced by process of attachment, this court has no hold of him; nor can it ever take hold of him, in any manner, so as to prevent him from making a mere sport of its decrees.
Some five and twenty years ago, it happened, that a purchaser under a decree of this court, became a bankrupt; and the solicitor, under an impression that relief could only be had by a regular suit, brought a bill, in which it is stated, that the land had been sold on a credit, and bonds taken of the purchaser, with a surety, to secure the purchase money; that the bonds were, by order of this court, assigned by the trustee to the complainant; that the purchaser had been regularly declared a bankrupt; and that the surety was insolvent. The purchaser and his assignees only, were made defendants. The bill prayed, that the sale might be annulled, that the bonds might be cancelled, and for general relief. The assignee answered and admitted the fact, and the bill was taken pro confesso against the purchaser. Upon which, the Chancellor, in his decree of the 7th of July, 1808, concisely observes, that ‘although the complainant might obtain relief in another way, and the neglect or refusal to pay money due for property sold, is not alone, a sufficient *652 ground to set aside a sale j’ yet, considering the circumstances of that ease, the sale was annulled, and the bonds cancelled as prayed, (c) In this respect, there are but two modes of proceeding in chancery, the regular and the summary way. The other way of which the Chancellor speaks, in this regular case by bill, must, therefore, be understood to mean the summary way by petition, for process of attachment against the purchaser, or for a resale, grounded on the equitable lien; which latter, must have been that other way, particularly alluded to. For, he certainly could not have referred to an action at common law, on the bond against this bankrupt purchaser, and his insolvent surety.
In the year 1821, a case occurred in this court, in which the party interested, applied for, and actually obtained relief, in that other way, alluded to, as' it is believed, by the Chancellor, in his decree of 1808. After the ratification of the sale, the purchaser had neglected and refused to pay the purchase money. Upon a petition of the trustee, representing the fact, the court passed an order commanding the purchaser to pay by an appointed day, or shew cause, or on default, an attachment would be ordered. The party made default, and an attachment was ordered. After which, the money was paid. (d)
The defence of this purchaser, in this case, is that the parties can only obtain redress by bill in equity or a suit at law. He has already, by petition, prayed relief of this court ;■ and after having obtained its decision in that form, and had that decision submitted to the revision of the court in the last resort, it surely ought not to be expected, that these tribunals would again consider and adjudicate upon that cause of controversy, if presented in a new shape, and merely put into the form of a suit by bill. The jurisdiction of this court over this matter was as extensively and beneficially exercised, on its being presented by petition, as it could have been in any other way; and the mode by petition is certainly the most usual and proper, if not the only one in which it ought to have been presented. Every objection which this purchaser chose to make ; and, no doubt, every one which he thought could be made, with any degree of plausibility, against the ratification of this sale, has been made, fully and maturely investigated, considered and decided upon here; and that judgment has been affirmed by the *653 Court of Appeals. The contract between this court and this purchaser is, therefore, now absolute, complete, and of record.
But now, in answer to an order calling on him to pay the purchase money, he says, that relief, or the means of forcing him to pay can only be obtained by bill in equity, or a suit at law. A bill in equity in this court would only be going over the same ground, that has already been gone over. It -would be idle repetition, an unnecessary and improper proceeding; and, therefore, cannot be allowed. This purchaser stands charged by the record and proceedings, now here, as the debtor of this court, for the benefit of its suitors, to a certain amount upon a judicial sale and contract, which has been duly investigated, and absolutely ratified and confirmed.
It is said, however, that a suit at law must be brought upon this contract. By whom must it be brought? Was a suit at law, grounded merely upon an order in chancery, ratifying a sale made under a decree, ever before heard of? Lord Hardwicke, as we ’have seen, has expressly declared, that there can be no remedy at law where all the contract arises out of the acts of the court amounting to a decree. But this court is to be regarded as the vendor; and as no bond or note has been taken from this purchaser, which could enable the parties interested to put their claim against him into the common law form of an action at law, how, or in what manner, is such an action to be brought ? Must they bring an action of debt, of assumpsit, or a special action on the case?
In all cases of this sort, where property has been sold under a decree to pay debts, or for other purposes, and no bonds or notes have been taken, there seems to be an insuperable difficulty in making proper parties to try the right at law to the whole purchase money, or to any dividend of it, either as against the purchaser, or any one or more of the litigating parties to the suit in equity. The powers of the trustee, if he takes no bonds or notes, cease with the ratification of the sale, as to all the purposes of a suit at law. The decree clothes him with no power to sue at law; and if it did, or this court were specially to direct him to sue, it must put into his hands the cause of action, the evidence of the debt, with its own order. The action must then be grounded upon an order of this court, and instituted in the name of its agent. It would be as if one court were to bring suit upon its own judg *654 ment in another court. Could such an action be sustained? I conceive it could not.
Chancellor Hanson, in an order of the 2d of May, 1803, in speaking of a contract between suing creditors about a dividend of the proceeds of their deceased debtor’s estate, says, ‘he had never thought it necessary in case of any disputed claim to send out an issue, or to refer the party to an action at law. Indeed, it would be difficult, in most cases, to ascertain the proper parties for an issue. The executor or administrator surely would not be compelled, without being a party, to act as defendant on the trial of the issue. However, in all cases where a claim depends on a single fact or facts strongly litigated, and of difficult investigation, the Chancellor conceives, that in some manner an issue ought to be tried.’ (e) The Chancellor may control the parties to the suit in equity, so as to compel them to submit to the trial of an issue at law in any form he may dictate. But, if a purchaser cannot be proceeded against here, he certainly cannot be controlled at law. (f) Upon the whole it is clear, that there can be no remedy against a purchaser at law independently of his bonds.- . .
It seems to be an opinion of some, that there was a distinction between sales for ready money, and sales on credit, where bonds or notes were given for the purchase money. But, as regards the purchaser, it is difficult to conceive how his liability, and the nature of his obligation can be substantially varied by the single circumstance of the purchase money having been made payable on the day of the ratification of the sale, or one day, or one month, or one year after that day. (g)
"When the term of the credit has expired, and the purchase money is actually due and demandable, it would seem necessarily to follow, that the payment might be enforced, as in all other cases, by any form of legal or equitable proceeding, by which, compliance with such a contract, might be enforced. And, that if the process of attachment might have been used to enforce a compliance, if payment had been stipulated to be made on the day of the ratification, it certainly might be used for the same purpose, at any time after, when the money became due; because such a mode of proceeding grows out of, and is incident to the nature of the contract between the court and the purchaser, and cannot be af *655 fected by any stipulation as to the mere time of payment. It is a mode of proceeding, necessarily incident to such a contract; because every particular of it, is a matter of record; and that too, in a court peculiarly fitted and competent to relieve against any accident, mistake or fraud that has happened, or may be discovered. Such a contract is not within the statute of frauds; and there is nothing left open for litigation or trial before another tribunal, or even before this court, which cannot be fully and satisfactorily inquired into and determined in the most summary way. The form and nature of the contract, precludes controversy, and supersedes all trial. There is, however, one, and but one question arising out of it left open, and that is, whether or not the money has been paid as stipulated ?
But when a sale has been made on a credit, and bonds have been taken to secure the purchase money, it has long been the established practice, after the day of payment has elapsed, to sue upon the bonds; which shews, as it is said, that they alone are looked to, and that all other modes of proceeding have been tacitly waived. But the bonds in such cases, are intended only as an additional assurance. And it would be contrary to all the analogies of the law, to construe the taking of one security, into an abandonment of another, where there was no incompatibility in the existence of both.
Thus it has been held, that although the statute requires the party who sues out a commission of bankruptcy, to give bond with surety, to answer to the party who maybe injured thereby, does not deprive the party injured, of any remedy at common law, other than upon the bond. He can, it is certain, have no more than one satisfaction for the injury, but to obtain that, he may sue either at common law on the special circumstances, or upon the bond. (h) So, the importer of merchandise becomes thereby, a debtor to the government for the amount of the duties imposed by the act of congress. But the law indulges the importer with a credit, on his giving bond for the duties ; yet the giving or not giving of a bond, does not supersede the right of action which accrues to the government by operation of law on the importation. The government may sue the importer on such legal liability, considering him as its debtor, or it may sue upon the bond, if one has been given. *656 They are considered as two assurances, each affording a remedy, or mode of obtaining one satisfaction, (i) So also, a receiver appointed by the Court of Chancery, is always required to give bond, with surety, to account. But in such case, the court may either proceed by attachment against the receiver alone, or upon the bond, (j)
In all these, and other like cases, the existence of the two securities, being perfectly compatible, the one with the other, .it has never been held, that the taking of one amounts to a tacit waiver of the other, (k) And consequently, the taking of bonds or notes with or without surety, of a purchaser under a decree, cannot, in any case, be construed as an abandonment of the right to proceed against the purchaser alone by attachment, to enforce the payment of the purchase money, after it has become due, and after the sale has been ratified.
But if the parties choose, as they may, to have the bonds or notes which have been taken of the purchaser, assigned to them in satisfaction of their claims, that have been established; (l) or to have the trustee directed to proceed against the purchaser and his sureties, in order to fix their liability by a judgment at law, and in that way to recover the purchase money,"suits may be brought upon the bonds or notes by the assignee, or the trustee, according to the uniform and long established course, where such has been the choice and object of the parties, (m)
It is a clear and well settled principle of this court, that where property has been sold under its decree, the court, as the vendor for the benefit of those interested, retains an equitable lien for the payment of the purchase money, (n) The most usual way of enforcing this lien, has been by petition' of a party interested, setting forth the facts, and praying that the property may be re-sold to pay the whole or the balance of the purchase money. And a sale may be ordered accordingly, at the risk of the delinquent purchaser. The proceedings, in such cases, are almost always infor *657 mal and summary, (o) The vendor under a decree, therefore, holds two securities for the payment of the purchase money; one is this equitable lien, and the other is the personal liability of the purchaser. It is conceded on' all hands, that the equitable lien may be enforced in a summary way. Can there then, be any conceivable solid reason, why the personal liability should not also be enforced in a summary way ? If it could not, there would be a gross incongruity in the rules of the court. But it is not so; the personal liability may be enforced in a summary way, and there is a perfect harmony in the rules and principles of the court.
Upon the whole, it is my opinion, that the purchase money of property sold under a decree, after the sale has been ratified, may be recovered either by an order and process/ of attachment of contempt against the purchaser himself, to compel him to complete his purchase after the purchase money has become due; or by a re-sale of the property, grounded on the subsisting equitable lien; or by an action at law against the purchaser and his sureties, upon the bonds or notes given by them for the payment of the purchase money.
Ordered, that no good cause having been shewn against the order of the 17th of March last, the same is hereby confirmed and made absolute. Also Ordered, that an attachment issue against the said Samuel Anderson, to enforce obedience to the said order, returnable to the next term.
From this order Anderson having appealed, a transcript of the record was sent up accordingly, and the case was argued before the Court of Appeals by the solicitors of the parties, (p)
June term, 1828.
By the Court of Appeals.
It appears from the proceedings in this case, that on the sale made by the appellee to the appellant, being reported to the Chancellor, objections to its ratification were filed by the appellant, and answered by the appellee, on full consideration of which, the sale was ratified, and that ratification affirmed by this court; it is, therefore, not competent for the appellant now to contest the propriety or validity of that sale, it having received the sanction of the highest judicial authority of this state. But it has been contended, that as the appellant never was *658 reported to the court as the purchaser of the property sold by the appellee, he cannot he compelled to complete the purchase by paying the purchase money. It does not appear, it is true, that the trustee in this case, has proceeded according to the usual practice of the court, in making a formal report of his sale; but it appears by the proceedings, that on the 9th of October, 1822, the appellant filed his petition to the Chancellor, in which he stated, that he had contracted with the appellee for the purchase of the land in question, supposed to contain one hundred and forty acres, at, and for the sum of $ 11 per acre, and by the report of the trustee, (the appellee,) was returned the purchaser, and prayed that the sale made and reported, might not be confirmed. On the coming in of the answer of the appellee, and the return of depositions, which were taken in pursuance of the Chancellor’s order, and upon the return of the locations made by the sheriff of the county, under the same authority, the Chancellor passed an order ratifying and confirming the sale, which order, on appeal, received the sanction of this court.
It is, therefore, now too late for the appellant to object that he was not reported, in the more formal and usual way, to the Court of Chancery, as the purchaser of the property. The trustee, moreover, in answering the petition of the appellant, against the ratification of the sale, refers to, and makes a part of his answer, the written contract of sale to the appellant, executed by both the appellant and appellee, which mentions fully, the terms of sale, and which is understood to be the sale ratified by the Chancellor. Under this view of the subject, this court are of opinion that there is nothing in the objection that the appellant was not reported to the court as the purchaser of the property, and that a good title cannot be conveyed to him in consequence of this irregularity in the proceedings.
It has been contended that the Court of Chancery has no power, by a summary proceeding, to compel a purchaser at a trustee’s sale, made under the authority of its decree, to complete his purchase by enforcing the payment of the purchase money. This objection, it is conceived, cannot be available in the case now under consideration. The trustee did not take either notes or bonds for the payment of the purchase money, upon which a suit or suits at law could have been instituted, but relied solely upon the liability of the purchaser arising from the contract of sale, which was not binding upon either party until ratified by the *659 Chancellor; but when ratified, it was his duty to pay the purchase money, or shew good cause to the contrary. Neither of which has he done in the present case; for neither the allegation of the trustee’s inability to comply with the terms of the sale, nor that the property, being in the possession of a third pers.on, the trustee was unable to deliver him possession, is supported by a shadow of proof.
Had the Chancellor, therefore, under the circumstances of this 'case, a right to adopt the proceeding to -which he resorted to compel the payment of the purchase money ? We think he had. The order of the Chancellor was, that Samuel Anderson, the purchaser, should pay the money to the trustee, or bring the same into court on a particular day, or shew good cause to the contrary. Under the terms of this order, it is not perceived why Anderson could not have made as full a defence, and have availed himself of all the objections, which could have been relied upon, in case an original bill had been filed against him to enforce the same object. Upon application to the Chancellor, setting forth that testimony would be essential to his defence, on the hearing of the order, the Chancellor would have passed an order to enable him to obtain it, upon the return of which a full hearing of the merits of the case might have been had; and if equity and justice required it, he would and ought to have been discharged from his purchase. That the Court of” Chancery in England has the power of compelling a purchaser to pay his purchase money after the confirmation of the sale, by an order for that purpose, is not to be doubted. Lansdowne v. Elderton, 14 Ves. 512; Newland Ch. Pr. 336. In Brasher’s Exrs. v. Cortlandt, 2 Johns. Ch. Rep. 506-7, it appears, that by the practice of the Court of Chancery, in New York, a purchaser may be compelled to complete his purchase; and Chancellor Kent is reported to have said, CI have no doubt the court may, in its discretion, do it in every case, where the previous conditions of the sale, have not given the purchaser an alternative.’
In this case it is quite apparent that procrastination and delay are the objects of the purchaser, as he has taken every measure in his power to prevent the ratification of the sale; and after the sale was ratified, on appeal to this court, has still refused to pay the purchase money, and has driven the trustee to resort to the compulsory power of the Court of Chancery to coerce payment. Under these circumstances, we think it a fit case for the exercise of such a power by that court; although it is not intended *660 at present to establish any general rule on the subject. There is nothing in the objection that the quantity of land sold has not been sufficiently ascertained. Order affirmed.
The plaintiffs by their petition stated, that the trustee Foulke had died, and thereupon prayed that some other person might be appointed in his stead.
1st March, 1827.
Bland, Chancellor.
The plaintiffs by their bill do not profess to sue as well for the other creditors of Stephen Scotton as for themselves. From the facts which they set forth,, it appears, that they were the holders of a vendor’s lien to secure the payment of the balance of the purchase money; and as such, in their proceeding to have the land sold for the payment of their claim, they had no such common interest with the other creditors of Stephen Scotton, as would enable them to sustain a creditor’s suit for the administration of his estate. (q) Yet from the manner in which the bill speaks of the insufficiency of the personal estate; and on having made Ashur Foulke, the administrator, a defendant, it may be inferred, that the plaintiffs contemplated their bill as the commencement of a creditor’s suit. The decree of the 5th of April 1822, by reciting, that the deceased Stephen Scotton did not leave personal estate sufficient for the payment of his just debts; and by directing the land to be sold for the payment of the claim, of the complainants and of such other debts of the deceased as should be established to the Chancellor’s satisfaction, evidently considers the proceeding as a creditor’s suit. But no notice has been directed to be given to the creditors of the deceased to bring in their claims; nor has any decree to account been passed against the administrator; on the contrary, all claim against him, as well by the plaintiffs to obtain satisfaction of their debt, as by these heirs to have the real estate descended relieved, by the application of the personalty which might be found in his hands, seems to have been wholly abandoned.
It now appears that the defendant, Ashur Foulke, the administrator, who had been appointed to make the sale, is dead; and that the suit had thus abated as to him. A suit which has abated as well in regard to the real as to the personal estate may be so revived as to proceed against either, leaving the abatement to stand as to the other, (r) So here, as this abatement does not *661 affect the plaintiff’s claim, or their proceedings against the realty, founded upon their equitable lien, it may be suffered to stand; and the case be allowed to proceed in all other respects; and for that purpose it will only be necessary to appoint some person to take the place of the deceased trustee.
Whereupon it is Ordered, that James Boyle be, and he is hereby appointed trustee, to carry the decree into effect; and in all respects he will be governed by, and pursue the directions of the decree in the same manner as if originally appointed trustee.
The surveyor, John W. Duvall, by his petition filed on the 3d of October, 1827, stated, that there was then due to him from each of the parties the sum of $15 for the survey made by him under the order of the 8th of January, 1823. Whereupon he prayed, that the trustee Boyle, and Samuel Anderson might be each of them ordered to pay him that amount.
3d October, 1827.
Bland, Chancellor.
Ordered, that James Boyle, the trustee, pay to John W. Duvall the sum of $15 for his services, as stated in his petition. And it is further Ordered, that Samuel Anderson pay to John W. Duvall the sum of $15 for his services as above stated; or that they, Boyle and Anderson, shew cause to the contrary on the first day of November next. Provided, that a copy of this order be served on each of them before the fifteenth day of the present month.
The trustee Boyle, on the 2d of November, 1827, filed his answer shewing cause against this order; in which he states, that although he admits, that the services were performed by the surveyor, and that his charge is reasonable; yet he did not render his account to the register until the 3d of October, 1827; that in consequence of this neglect the register in taxing the costs, set out in the record, transmitted to the Court of Appeals, had not included the fees now claimed by the surveyor; that a fieri facias was issued against Anderson from the Court of Appeals for the costs, and charges of the two courts as taxed by the register and clerk; that it would be unjust, that the estate of Stephen Scotton should have to pay these fees, now claimed by the surveyor without having any resort to Anderson, as the fieri facias so issued from the Court of Appeals has been fully satisfied.
The time of hearing this matter having been enlarged, Anderson *662 also came in on the 20th of March, 1828, and shewed for cause against this order, that the orders of the 8th of January and 17th of April, 1823, under which those surveyor’s-fees had accrued, having been affirmed, they could not now be opened for the purpose of taxing the costs anew. And that the surveyor had by his own neglect precluded himself from claiming those costs ; because Anderson- could not have recovered them from the trustee in case the order of ratification had been reversed.
24th March, 1828.
Bland, Chancellor.
The matter of the petition of the surveyor standing ready for hearing, and the solicitors of the parties having been fully heard, the proceedings were read and considered.
It is very clear, that if the surveyor had made out a bill of his legal fees upon the plot and certificate returned by him on the 19th of March, 1823, they would have been taxed by the register as a part of the costs properly incident to the order of the 17th of April, 1823, from which Anderson appealed; and consequently, would, with the other costs arising out of the same controversy, have been ordered by the Court of Appeals, in their affirmance of that order of the 16th of July, 1825, to be paid by Anderson. Hence it is evident, that Scotton's estate should not now be charged with these fees, as those who claim that estate have no means of obtaining reimbursement from Anderson, now that their fieri fiadas on that judgment of the 16th of July, 1825, of the Court of Appeals, has been fully satisfied; for it is not pretended, that it was, in any respect, their fault, that the surveyor’s fees were not comprehended by that judgment. It is evident, that these fees ought to have constituted a part of the costs which Anderson was ordered to pay by the judgment of the Court of Appeals ; hut now, in this stage of the proceeding, after the affirmance of the order of the 17th of April, 1823, this court has no power to open that judgment, so as to let in these costs as a part of it; nor can this court now, in this summary way, enforce the payment of any sum of money which ought to have formed a component part of that judgment, and which had been omitted by the negligence of the party himself. If the surveyor has any remedy, it must be by a special action on the case against Anderson. Therefore, it is Ordered, that the said petition be, and the same is hereby dismissed with costs.
The trustee Boyle, by his petition, filed on the 26th of July, 1828, stated, that the Court of Appeals had affirmed the order of *663 the 12th of- May, 1826, whereupon he prayed an attachment against Anderson to enforce obedience to that order; which was granted as prayed, returnable to the then next term.
23d September, 1828.
Bland, Chancellor.
Samuel Anderson having been brought into court on an attachment to enforce obedience to the order directing him to pay the amount of the purchase money then due; and the trustee having prayed, that he, Anderson, be committed, he produced a certificate from the clerk of Anne Arundel County Court, of his personal discharge by that court under the insolvent laws. Whereupon it is Ordered, that the said Samuel Anderson be, and he is hereby discharged from custody, according to the provisions of the act of assembly in such case made and provided, (s)
The trustee Boyle, by his petition, filed on the 21st of February, 1829, stated, that the land sold to Samuel Anderson would not now bring near the amount he had contracted to pay for it; that the sureties, James Anderson and John Stewart, in the appeal bond given by Samuel Anderson on his appeal from the order of the 12th of May, 1826, were sufficiently good. Whereupon the trustee Boyle prayed the advice and direction of the court in what manner to proceed; by passing an order, that a re-sale should take place, or that the bond should be sued, or both; and if a re-sale should take place, that Samuel Anderson and bis sureties should pay the difference, or such other relief as might be consistent with the circumstances of the case.
25th February, 1829.
Bland, Chancellor.
This petition of the trustee having been submitted, the proceedings were read and considered.
On a sale of real estate, made under an order or decree of this court, it retains an equitable lien until the purchase money is paid; this lien stands in all respects upon the same footing as a vendor’s lien in case of a sale by a private person; and is in no instance weakened or destroyed by the bonds or notes which the trustee may be directed to take from the purchaser; nor can it be at all impaired or relinquished by any act of the trustee not sanctioned by the court. This lien arises from and is incident only to the relationship of seller and purchaser; and is peculiarly and exclusively *664 a privilege of the vendor. These principles of equity I take to have been long and well established here as well as in England. (t)
It may be regarded as a general rule, that the obtaining of one security does in no instance operate as a suspension or extinction of any other security for the same claim; and that the party may, in all such cases, obtain redress either on the one or the other of them at his option. This rule might be exemplified by a great variety of cases to be met with in the books, (u) The case under consideration is an example shewing, that where a purchaser has given bond with surety to the trustee, as required by the decree, there are three distinct securities for the payment of the purchase money. The equitable lien, under which the land may be re-sold. The personal liability of the purchaser, upon which he may be proceeded against in a summary way by attachment. And the bond upon which the purchaser and his sureties may be sued at law. There can be'no doubt, that the payment of the purchase money may be enforced by proceeding upon either one of these securities separately; since there is nothing in either incompatible with the contemporaneous existence of the others; nor does the acceptance of any one operate as a suspension or extinction of the others; or imply an abandonment of them.
But there is a material difference between securities for the payment of money and the remedies founded upon such securities; for, although there may be nothing in such securities themselves inconsistent with their mutual existence; yet the institution of a suit upon one may, from its nafure, • amount to a suspension or waiver of the remedy upon the others at the same time. The English statutes require, that the party who sues out a commission of bankruptcy shall give bond in the penalty of £200, to answer to the party grieved by falsely and maliciously suing out such commission ; and the giving of such bond, it has been held, does not take away the common law remedy by action on the case. But the party grieved cannot sue on both at the same time; because in the action on the case he submits to the jury whether he is entitled to less or more than £200; and in the action on the bond he decides, that his claim is neither more nor less than the penalty of £200. But he cannot have that penalty in addition to what a *665 jury may say he is entitled to recover. Hence the electing to obtain redress by either one of those modes amounts to a waiver of the that, so that both cannot be prosecuted at the same time. (v)
In most cases however, the party may resort to all his securities and have all his remedies put in operation at the same time. As in the case of a pawn, the right to detain which is not divested by the pawnee’s also taking a covenant or further security on which he may sue the person of the covenantor. The covenant is considered as affording an additional remedy and the party may proceed on both. (w) So too the holder of a promissory note or bill of exchange may sue the maker or drawer and each endorser separately at one and the same time; although he can recover but one entire satisfaction, (x) And so too under the process of this court, which is more effectual than that of the common law tribunals; there may be a sequestration against the goods, although the party himself is in custody upon an attachment: whereas at law, if a capias ad satisfaciendum is executed there can no fieri facias issue. (y)
Where the debt has been secured by a mortgage, a covenant to repay, and a bond, the creditor may be allowed to pursue all his remedies at once. He may bring an action of covenant to repay the money; institute an ejectment against the tenant in possession ; file a bill in equity to foreclose; and also maintain a suit upon the bond at the same time. But he cannot have the mortgaged property awarded to him by a decree of foreclosure, and also recover the money or any part of it from the debtor by a suit upon the covenant or bond, (z)
The mortgaged estate is considered as a pledge sufficient for the satisfaction of the debt; and as having been so taken by the parties themselves by the nature of their contract. Therefore if the creditor, on his bill in equity, has a decree to foreclose and nothing more, he is held to have obtained that kind of satisfaction of his claim for which he stipulated; and if after such a decree he sues upon the bond, he thereby opens the decree, and admits the right of the mortgagor to redeem; because by the institution of the suit he disclaims the satisfaction he had obtained by the *666 decree. And if he has placed it out of the mortgagor’s power to redeem, by aliening the estate after the decree, he will be perpetually enjoined from proceeding upon the bond. But if the creditor on his bill in equity, instead of a decree to foreclose, obtains a decree for a sale; and the mortgaged estate sells for less than the debt, the balance may be recovered in an action on the covenant or bond, without opening or affecting such a decree for a sale, by which the pledge itself is not taken as a satisfaction as by a decree to foreclose, (a) Hence it is evident, that the use of a mortgage covenant, or bond to repay is to enable the mortgagee to recover his debt as far as practicable, in that way, leaving him to his right of foreclosure, or sale of the mortgaged property, for the recovery of the balance; or as a means of recovering the residue of his debt by an action on the bond or covenant, in case the estate on a sale should prove inadequate to the burthen of the mortgage money. (b)
The court has been authorized by an act of assembly to decree a sale of the mortgaged property; (c) but the provisions of that act have been always considered as having merely introduced an additional remedy, and not as having abrogated any pre-existing mode of relief, to which the mortgagee was entitled, or to have altered the proceedings in this court on mortgages, in any other respect whatever; and therefore, the mortgagee may now, notwithstanding the provisions of that law, have a decree of foreclosure instead of a decree for a sale, (d) If the creditor files a bill on the mortgage, *667 and obtains a decree for a sale; and the proceeds of sale should not satisfy the debt, he cannot have a decree in equity on such *668 bill against his debtor, for the balance of the debt; because it would be at variance with the substantial nature of the case set out in his bill; which is, that he should by that proceeding in rem, obtain satisfaction of his claim from the pledged subject itself, either by having an absolute title assured to him in the form of a foreclosure; or by having it sent into the market, and the money due to him, raised by a sale; and not that he should be allowed to enforce payment of his whole debt, by proceeding against the person of his debtor, or against any other of his property than that so mortgaged. And besides, to pass a decree for the payment of the balance, would be to grant relief in a case, where it is most manifest, the creditor might be as effectually relieved at law. (e) But there is no rule of equity by which he can be delayed or enjoined from recovering the balance remaining so unsatisfied, in an action at law upon the bond, note, covenant, or assumpsit. And these principles of equity appear to have been indirectly recognized by the legislature, in an act for the benefit of foreigners, who lend money on mortgage here, by which it is declared, that if sufficient be not raised in such case, by a sale for the satisfaction of such foreign creditor, the court shall decree the balance to be paid by the mortgagor; (f) and they appear to have been in like manner recognized, by an adjudication of the Court of Appeals, (g)
*669 Hence, it is clear, that in all cases, either before or after a decree for a sale, if the mortgaged estate should not sell under the decree, for enough to satisfy the debt, the creditor may prosecute or institute a suit upon the bond, or any other collateral security, and recover the balance.
The equitable lien held by the court, as in this instance, is in the nature of a mortgage; the estate may be sold under it, as under a decree upon a mortgage; (h) and considered as a security for the payment of money, it is, to all intents and purposes, a mortgage. And there is nothing, according to any fair principle of analogy, which should forbid the pursuing of any other remedy for the recovery of a debt, secured by such an equitable lien, any more than suing on a bond for a debt secured by a mortgage.
In this case, there has been no bond or note given directly for the payment of the purchase money. The appeal bond was not given for the payment of the purchase money as such. But, by the order of the 12th of May, 1826, it was adjudged, that Samuel Anderson, was in fact, the purchaser, and that he should pay the amount of the purchase money. From which order, he appealed, giving bond in the usual terms, to prosecute his appeal with effect; that is, to have the order reversed, or if it should be affirmed, to pay the amount so ordered. (i)
The orders of this court, absolutely affirming the sale, and requiring the purchase money to be paid, are substantial parts of that contract between the court and the purchaser, upon which the equitable lien rests. The appeal bond is a security, that the order directing the purchase money to be paid, if affirmed, shall be complied with; consequently, it must be considered as standing in the same relation to the equitable lien, that a common bond does to a mortgage, to secure the same debt. They are treated as separate securities, having for their object, the assurance of the payment of the same debt; and therefore, the remedy on each may be pursued at the same time, and prosecuted on both, until an entire satisfaction has been obtained.
But the purchaser, Samuel Anderson, has been taken in execution, under an attachment, and personally discharged, under the insolvent laws; (j) yet, as that cannot operate as a bar to any of *670 the creditor’s other remedies for the recovery of his claim; (k) and as it is not improbable, that a portion of the purchase money may be obtained from his estate; and if so, it is fit and proper that he, as the principal debtor, should be made to pay as far as satisfaction can be obtained from him, or his estate, in relief of his sureties in the appeal bond; I shall therefore Order, that the lands be re-sold; that the trustee of this court, apply to the trustee of Anderson, under the insolvent laws, and endeavour to obtain a dividend of his estate, if there be any; and also, that the trustee of this court, put the appeal bond in suit.
Whereupon it is Decreed, that the trustee James Boyle, proceed immediately to make sale of the said land for the payment of the purchase money due thereon; and the said sale shall be at the risk of the said Samuel Anderson; and the terms of the said sale shall be for ready money, to be paid on the day of sale, or on the day of the ratification thereof, with legal interest from the day of sale; in all other particulars, the trustee is directed to conform to the decree of the 5th of April, 1822, according to which, and the order of the first of March, 1827, he has given bond for the faithful discharge of the trust reposed in him,', by that or any other decree or order, in the premises. And it is further Decreed, that the trustee James Boyle, without delay, make application to the trustee of the said Anderson, under the insolvent laws, and by all lawful ways and means, endeavour to obtain a dividend of his estate, if there be any, in proportion to the whole amount of the principal and interest of the purchase money, and costs due and owing from the said Anderson. And it is further Decreed, that the trustee James Boyle, do also forthwith institute suit upon the said appeal bond, and prosecute the same without delay, until he shall obtain full satisfaction, if to be had, of the said obligors, of the whole amount of principal, interest and costs, recoverable thereon. And it is further Decreed, that the trustee James Boyle, bring into this court, all sums of money he may receive or recover in any of the modes herein before specified, and make report of his proceedings accordingly, to the end, that no more may be collected by the said several modes of proceeding, than one entire satisfaction of the whole amount of principal, interest and costs, which ought to be paid by the said Samuel Anderson.
*671 Under this decree, the trustee proceeded to make sale of the land which had been previously sold to Samuel Anderson; and on the 27th of April, 1829, reported, that he had made sale of it; upon which, it was Ordered, that the sale should be ratified, unless cause was shewn to the contrary, before the 27th of June, then next.
The plaintiff Andrews, by his petition, filed on the 17th of June, 1829, stated, that the sale as reported, had been made for $3 10 per acre; that he had, by a letter to the trustees, before the day of sale, offered, and was then willing to give $3 57 per acre, for the land. He expressly admits, that there was no fraud in the transaction ; but prays that a new sale may be ordered, so that he may be let in to bid the amount he had previously offered. The trustee admitted the truth of the facts so stated by Andrews.
18th June, 1829.
Bland, Chancellor.
This petition of the plaintiff Andrews, having been submitted without remark, the proceedings were read and considered.
I have before said in this case, that there has been no instance of opening the biddings here, merely to let in a higher bid; and this is the' first proposition of the kind, that I have any knowledge of having ever been made to this court. (l) If any small advance in price, such as that now offered, were to be admitted as a sufficient ground for letting in a new bidder, to the exclusion of the reported one, it is obvious, that the practice might greatly embarrass sales under decrees of this court. By adopting the English practice of opening the biddings, as it is called, the regularity of public sales by trustees, as practised here, would be virtually broken in upon, and destroyed by the court itself; bidders would be discouraged; sales delayed; and the expense much increased; for it could not be deemed proper to receive a bid in any form, without allowing a day to all interested, to come in, and shew cause why the sale should not be ratified. Upon general principles of convenience and economy therefore, I deem it improper in any case, to reject a reported sale, merely to let in a higher bid, where no fraud, misrepresentation or unfairness is pretended or charged. Whereupon it is Ordered, that the said petition be, and the same is hereby dismissed with costs.
*672 After which, no causé having been shewn, the sale as made and reported by the trustee Boyle, was, on the 29th of June, 1829, finally ratified and confirmed. And some time after, a motion was made to adjust the commission on the sale of the 28th of August, 1822, as between the late and the present trustee.
28th May, 1830.
Bland, Chancellor.
Ordered, that a commission be allowed on the sale, ratified by the order of the 17th April, 1823, according to the rule of the court; two-thirds thereof to be awarded to the late trustee; and the residue to the present trustee.
The auditor on the 22d of July, 1830, filed a report, in which he says, that he had stated an account between the estate of Stephen Scotton, and the late trustee Foulke, in which he had applied the proceeds of the sale of the 28th of August, 1822, as of that day to the payment of the trustee’s commission, costs of suit, and the claim of the complainants; leaving a balance of $427 24 unappropriated. The original decree provides, that the said estate shall be sold fqr the payment of the claim of the complainants, and such other debts as shall be established to the Chancellor’s satisfaction. But no notice has been given to creditors to’ produce their claims, nor has any other claim been filed.
22d July, 1830.
Bland, Chancellor.
On referring to the order of the first of March, 1827, it will be seen why it is deemed unnecessary now to give notice to the creditors of Stephen Scotton, deceased, to bring in their claims, as suggested by the auditor. As this report of the auditor relates exclusively to the , application of the proceeds of the first sale, the balance therein spoken of, must remain unappropriated until further order.
Ordered, that the aforegoing report and statement of the auditor, be, and the same are hereby ratified and confirmed;, and the trustee is directed to apply the proceeds accordingly, with a due proportion of interest, that has been or may be received; reserving the unappropriated balance until further order.
See this case as Anderson v. Foulke, 2 H. & G. 346.

 1785, ch. 72, s. 7; April, 1787, ch. 30, s. 5.

 5 Geo. 2, c. 7,

 Savile v. Savile, 1 P. Will. 745.

 Ex parte Minor, 11 Ves. 560; Lord v. Lord, 2 Cond. Cha. Rep. 253; Shewen v. Vanderhorst, 4 Cond. Cha. Rep. 461.

 Lawson v. The State. — This bill, filed on the 21st of February, 1800, states that the late John Semple, on the 1st of April, 1769, to secure the payment of a large debt, as specified in the exhibit, mortgaged to the plaintiff James Lawson, of Scotland, the tract of land called Semple’s Manor, containing more than seventeen thousand acres; and that the defendant’s estate therein was confiscated and vested in the state; but that the state never took possession, &c. Prayer for a sale, to pay debts, &c. On the answer of Luther Martin, the attorney-general, a sale was decreed accordingly.
lsi December, 1803. — Hanson, Chancellor. — In this case a sale hath taken place under a decree, passed with consent of the parties, the Chancellor having exercised no judgment, except that he was previously satisfied there was nothing fraudulent or improper in the decree framed and agreed to as aforesaid. On the report of the trustees, that they had made a sale, and assigned reasons for the terms of the sale different from what might have been expected from the expressions in the decree, and in their advertisement. The Chancellor, as is usual in such cases, passed an order, which has been duly published according to its tenor, declaring that he would ratify the sale, unless objections should be made on or before the third Tuesday of November, 1803; provided the order be published, &c. &c.
*639 After that the Chancellor received what, on first sight, he supposed a private sealed letter, but under the cover, containing no letter, he found enclosed a petition with thirty-two signatures, several of which he could not read, stating, in effect, as an objection to the sale, that it was not made as expected ; that the land was sold entire; that if sold in parcels it would have commanded more money; and that the signers wished and intended to become purchasers, provided the land had been laid off in parcels so as to suit them. The said petition also contained expressions highly injurious to the characters of the trustees and the purchaser; and at the same time plainly declared, that the petitioners would apply for legislative aid, unless the Chancellor would set aside the sale as fraudulent and villanous.
Although the petition came in so questionable a way, and was so insulting to the Chancellor, calculated as it plainly appeared, to intimidate him from the free exercise of his own judgment, and to control even his conscience; although he considered it as an attempt eventually to interruptor defile the pure stream of justice, he sent the petition, such as it was, to the Chancery office, to be there filed, and to stand as an objection to the sale.
It has always been his practice, when an objection is made to a sale, to wait until the day appointed by his conditional order of ratification; and upon application, on or after that day, to appoint a time for hearing the objection, if any there be made. No application has been since made by any of the signers of the petition, or by any person in their behalf.
But on this day an application has been made by the trustees, on their own account, and in behalf of the purchaser; and the Chancellor thereupon proceeded to an examination of all the papers, in order that he might determine on what is proper to be done. Amongst these papers he finds several instruments of writing-, by which a considerable number (about one-half) of the persons whose names are subscribed to the petition, have prayed, in effect, that they may not be considered as petitioners against the sale. Not one of the others has come forward, either in person or by a solicitor or agent, or by writing, to support the petition. On the other hand, the party most interested in the sale has filed a petition, stating that the sale has been with his perfect approbation; and most powerful reasons are assigned by him wherefore it was so approved.
But let it be considered who are the persons in contemplation, of either law or equity, interested in the sale. Not surely a person who was neither the mortgagor nor a mortgagee, nor claiming under either mortgagor or mortgagee, nor claiming under the state of Maryland. Not surely the man who conceives himself interested merely because he wished to become a purchaser, and who was disappointed because the land was not laid off in such parcels as to suit his convenience. In short, it was only a mortgagee, or the state, which was truly interested in the sale. One mortgagee, and the principal one, as aforesaid, has expressed entire approbation. No objection has been made on the part of the state, or of any other truly interested person, although notice has been duly given. And upon the whole, the Chancellor perceives no reason wherefore the sale should not be immediately ratified; protesting however, contrary to a point made by the trustee, that if a reasonable objection had appeared, he would have considered it as immaterial by whom made. Having the control of sales, he deems it his duty to avail himself of any information whatever, and never, knowingly, will he ratify a fraudulent, unfair, or unreasonable sale. He will, however, always make a distinction between volunteer objectors and ob *640 jectors who are truly interested. And what that distinction is, may appear from what he has already said.
It is Ordered, that the sale made by Philip Barton Key and William Marbury, as stated in their report, of a tract or body of land called Semple’s Manor, be, and it is hereby declared to be absolutely ratified and confirmed.
After which, upon further and additional information, this matter was again brought before the court.
4th December, 1803.. — Hanson, Chancellor. — The sale in this case reported hath been ratified, because no person legally interested had made any objection, and because no other person had come forward, either in person or by solicitor, to support the objections transmitted in a private letter, or to shew their validity. But the Chancellor having since received information, which would have had weight in case he had received it before, viz. that persons interested in the sale are dissatisfied, and the Chancellor having reason to believe that ignorance or want of notice may have prevented persons from appearing, to make or establish objections; and having always, with respect to sales, availed himself of information, in whatever way obtained:
It is, thereupon, Ordered, that the order for ratification passed in this cause, be, and it is hereby set aside and revoked; and that on the 15th day of February next, the Chancellor will determine finally whether or not the sale shall be absolutely ratified;
It is not on conviction or belief, that the trustees have acted improperly, that the Chancellor passes this order. It is barely that hereafter there may be no cause for alleging, that the case was not determined on its merits.
This order is directed to be served on one or both of the trustees, and published as early as may be in the Republican Advocate, and in the Fredericktown Herald, and in Grubie’s German paper in Hagerstown. Unless published before the end of this month, a further time may be allowed for the decision.
This order having been served and published as required, the matter was again brought before the court.
15th February, 1804. — Hanson, Chancellor. — This day having been appointed to decide on objections made to the sale of the tract of land called Semple’s Manor, the Chancellor proceeded to an investigation of the subject. On examination of the papers in the cause, it does not clearly appear who are the parties principally interested in the sale. The decree for the sale was passed by consent, contrary to his expressed opinion, before the claim of the complainant was ascertained; and.notwithstanding the attorney-general had filed interrogatories to be answered by the complainant. He now deeply regrets that he passed the decree before all the equity was settled, notwithstanding those who appeared to be all the parties interested had assented to it. An objection, whether properly made or not the Chancellor does not determine, is put in on the part of the state ; and what the interest of the state is cannot immediately be determined. On the whole, the Chancellor conceives that his decision ought to be postponed.
It is thereupon Ordered, that on the first Monday of May next, the Chancellor will finally decide whether or not the sale of the tract of land called Semple’s Manor shall be ratified; and that depositions of competent witnesses, taken before a judge or justice, shall be received as evidence on that hearing of the cause. It is further *641 Ordered, that in the mean time, if practicable, the auditor shall state the claim of the complainant, after giving notice to the attorney-general of the time and place of stating the same.
But the Chancellor wishes it to be understood, that no order he has passed on the subject is founded on a conviction or opinion that the trustees have violated their duty. The circumstances of the case, independent of the objections against them, are such as in his opinion absolutely demand a postponement.
After which this matter was again brought before the court.
25th May, 1804. — Hanson, Chancellor. — The Chancellor at length proceeds to a final decision on the sale of the tract of land called ‘ Keep Treiste,’ or ‘ Semple’s Manor.’ Several appointments of days have been made for this purpose; and he expected that every person who considered himself entitled to any part of the land, or the money to arise from the sale, would come forward in a regular and proper manner. He is disappointed; and he is to decide, as well as he can, on such information as he has received.
He must first remark, that on the day appointed for ratification nisi, &c. it did not appear to him that any person'whatever, who had either a legal or an equitable interest, had made an objection to the sale reported by the trustees; but it appeared to him, that the only person to be benefited by the sale had, by his agent, given it his full approbation. He did not think it becoming to postpone a ratification on account of the objections made by a letter, from persons who did not state that they had either a legal or equitable interest in the land or money, and of whom many, by writing here filed, had either disavowed or withdrawn their objections.
Under the circumstances of the case, however, it might have been advisable for him to allow a further time for making or supporting objections. The decree for the sale, as he intimated at the foot of it, was perhaps premature, although made on the written agreement of the complainant and defendant. It might be premature, because it had not then, nor has it yet, been ascertained whether any thing, or how much, was due to the complainant.
With respect to sales under the authority of this court, the Chancellor thinks himself bound to act as if the property were his own, or held by him in trust. That is to say, he thinks that reasons which would induce him, as proprietor or trustee, to set aside a sale made by his agent, should determine him as Chancellor, to refuse his approbation to a sale made by a trustee. He has always availed himself of information, by whomsoever conveyed, in deciding on the merits of the sale. Having, after he passed the order in this case for ratification, received information respecting the interest in or title to the land or money aforesaid, he considered himself at least justifiable in rescinding the order and appointing a day, of which notice was to be given, for deciding on the case.
He regrets the inconvenience which may have resulted from that order; although he insisted that, as the case presented itself to him at the time of passing the order, he could not do otherwise. He knew of no parties or persons interested except James Lawson the complainant, or the defendants, the state, who could be contemplated, either in law or equity, as interested in the sale. The former as mortgagee, and the latter was standing in the place of Semple, the patentee and mortgagor of the land. The attorney-general, representing the state, had first agreed to the sale, and he did not object to it after it had been made, and after the usual notice.
But, after the information the Chancellor has since received, he cannot hesitate to *642 declare his opinion, that the sale ought to be vacated. It is undoubtedly one object of each decree for a sale, to obtain the best price that can be obtained, consulting at the same time justice to all persons concerned, and attending to their wishes as far as may be consistently with justice. The Chancellor, as has been already intimated, passed the order for confirmation, merely because it appeared to be the wish of the only party entitled to receive the net money arising from the sale. The circumstances since disclosed to him, make the case appear very different.
It seems that there are concerned several persons who have not given their approbation, and it is doubtful whether the complainant is entitled to receive any part of the money aforesaid. It is certain, that when Semple’s Manor was sold entire, a sale in that manner had not been announced before the day of sale. It is most probable, that the trustees had not before that day contemplated such a sale, and were determined by circumstances that then took place. Rut if they then discovered that a sale in parcels, agreeably to their advertisement, was impracticable, or would not be advantageous to the persons who were to receive the money, it would have at least been prudent for them to advertise, or give notice of a future day, when they would sell the whole together, or divided into large parcels laid off by the surveyor. It cannot be supposed, that'any person went to the place of sale with an expectation of having the whole body of land set up. The Chancellor, however, thinks it his duty, in mere justice to the trustees, to declare, that in his opinion there is no ground for concluding that they were guilty of fraud, corruption, or undue combination, in making the sale. He believes from a careful examination of all the proofs, that they acted according to their judgment as faithful trustees; but he cannot for a moment doubt, that their judgment was erroneous, even if the land hereafter should not command a higher price than they sold it for.
It is accordingly Ordered, that the sale made by Philip Barton Key and William Marbury, of the aforesaid tract or body of land called ‘ Keep Trieste,’ or ‘ Semple’s Manor,’ be, and it is hereby declared to be set aside, vacated, and annulled.
The Chancellor, for the present, declines to pass any decree or order relative to another sale of the land; but he is anxious to make, without delay, such arrangements as may do complete justice to every party concerned. Let the counsel, if they think proper, agree upon another sale, to be prescribed by a decree. He conceives that, notwithstanding the statement of the report, the land may conveniently be laid off in parcels from one hundred to one thousand acres; and that payment may be as directed by the original decree. That the land, if the legal title thereto be vested in the state, ought to be sold, he thinks unquestionable. But, strange it is, that persons having a claim superior to Lawson’s, should not come forward in a regular proper manner. Should it appear that any person, not a party to the suit, has a legal title to the land itself, assuredly it ought not to be sold. — M. S.

 Gibson’s Case, 1 Bland, 188.

 Sugd. Vend. & Pur. 18, n.

 Sugd. Vend. & Pur. 37; 1 Newl. Pra. Cha. 334; 2 Fowl. Exch. Pra. 255.

 Annesley v. Ashhurst, 3 P. Will. 282.

 Sugd. Vend. & Pur. 45.

 Land. Hoi. Ass. 253.

 Brown v. Wallace, ante 586.

 Stapylton v. Scott, 13 Ves. 425.

 Christie v. Hammond. — This was a creditor’s bill, filed by James Christie and others against George A. Hammond and others, the devisees and executrix of William Andrews, deceased. The defendants answered, and admitted the claims of the plaintiffs and the deficiency of the personal estate.
20th Juné, 1791. — Hanson, Chancellor.^-Decreed, that the real estate b'e' sold, that William McLaughlin be the trustee to make the sale, &.c. ‘ And that When the said sale shall have been approved, ratified, and confirmed by this court, and the purchase money shall have been paid to the said trustee or his successor, oí the bonds shall have been assigned under the directions of this court, the said trustee, or his successor shall, as trustee, convey,’ &c.
After which other creditors came in, and filed the vouchers' of their clainis.
25th May, 1795. — Hanson, Chancellor. — The Chancellor having examined the claim of James Christie, founded on five bonds for £100 each, and costs of suit and interest from the date 18th of March, 1775, to the 30 th of April, 1793, excluding the time from the 4th of July, 1776, to the 3d of September, 1783, that being the duration of the war between the United States and Great Britain, to whom the complainant is a subject, and the said claim amounting to £839 14s. 3d. It is adjudged and Ordered, that on the application of the said Christie, oí his attorney in fact, assignee, or other legal representative, the trustee, R. B. Latimer, assign and de *646 liver in or towards the discharge of the said claim, any bond or bonds taken on the sale of the said Andrews’ real estate, unless from obligors who'are also claimants,, on which interest is chargeable from30th of April, 1793, and of'Which the principal doth not exceed the sum of £839 14s. 3d.
After which the. case was brought before the court lor further directions, in' regard to the sales made by the trustee.
14?7j March, 1797. — Hanson, Chancellor. — Tfie location and quantity of the lots' of land sold by thé trustee to Isaac Van Bibber appearing to be uncertain, the surveyor is Ordered to survey and return plbts, &c.
The surveyor having made return of a plot and certificate, as directed by this1 order, the matter was again brought before the court.
24ih January, 1799. — Hanson, Chancellor. — John B'oul'din, surveyor, having made' out and returned a certificate and plot of numbers 1, 2, and 3, of the land of the said William Andrews, sold to Isaac Van Bibber By William McLaughlin, former trustee ; and the present trustee, Randolph B’. Latimer, and the said Isaac Van Bibber, having, by writing in this court filed, agreed that the certificate and plot aforesaid contain the true location of the said lots numbers 1, 2, and' 3 - it is thereupon' adjudged and Ordered, that the lands sold by the said McLaughlin to the said Van Bibber, are accurately described by the said certificate, except as herein after mentioned ; that the said sale be hereby absolutely ratified and confirmed; and that the’ said trustee, Randolph B'. Latimer, provided' the purchase money of the/said lots-hath already been paid, or on payment of the said purchase money, shall, in the manner directed by the original decree in this cause, convey unto the said Isaac’ Van Bibber and his heirs the aforesaid three lots of land) according to the description' in the said certificate, except that the deed of conveyance shall describe the twenty-third line of the’third lot as running south nine degrees and one-half west, instead of nineteen degrees and one-half west; the examiner-general having examined the’ plot and certificate, and having suggested the correction.
And inasmuch as the said three lots do not contain-so much land as they were-sold for by the said McLaughlin, it is further Ordered, that the said Van Bibber shall have an allowance for the deficiency, viz. for 28 acres, 2 roods, and 20 perches in lot number 1; for 2 roods in lot number 2; and for 1 rood'in lot number 3; amounting in the whole to 29 acres, I rood, and 30 perches.
Ordered, further, that the said trustee, out of the money arising from the sale of the real estate of the said William Andrews, do pay the expense of the survey and delineation of the said lots, amounting to the sum of sixieempounds ternshillings-

 Brown v. Wallace, ante 586.

 Goodwin v. Scott. — The complainants were purchasers under a decree of the defendants, who were the trustees. A suit at law had been brought against them by the trustees for the purchase money; and they now brought this bill, haying discovered, as they alleged, that the land was deficient in quantity, and that the trustees could make no title, because there were other incumbrances not made known at the time of sale.
September, 1806. — Kilty, Chancellor. — The right and title of the parties to the original suit, whatever it might be, was to be sold; and no person, whether part buyer or part seller, was bound to examine into the title of the estate, which was in custodia legis, and vested in the trustees, who were not competent to make the objection of any latent or obvious defect. In this state it has been repeatedly declared that, in sales under a decree of this court, which are made subject to the Chancellor’s approbation and ratification, any circumstances shewing that such sales are injurious to the complainants, or that better sales might reasonably and probably have been made, are sufficient to set them aside. This principle to be just, should be reciprocal and mutual. And the ratification that has been given, can make no difference as to the present claim. Under all the circumstances, the Chancellor vacated the sale for one of the lots, and made the injunction to stay the proceedings at law in part perpetual. And the lot, the sale of which was thus annulled, was ordered to be again sold entire, and not by the acre. It was objected, that inasmuch as a survey was made of the lands and a plot exhibited, the smallest variation would destroy the contract. The true location, however, is not so much the point in dispute as the substantial value of the land, and if that is not altered the difference forms no ground of relief. Different surveyors have made it different in quantity, and if the purchaser has ,an allowance for the deficiency, it is all he can require.

 Sugd. Vend. & Pur. 47.

 Anonymous, 2 Ves. jun. 336

 Anonymous, 6 Ves. 513.

 Langfort v. Tiler, 1 Salk. 113.

 Savile v. Savile, 1 P. Will. 745.

 Attorney-General v. Day, 1 Ves. 218.

 Ex parte Minor, 11 Ves. 562; Casamajor v. Strode, 1 Cond. Cha. Rep. 195; Bligh v. Darnley, 2 P. Will, 620; Carpenter v. Thornton, 5 Com. Law Rep. 225.

 Cunningham v. Williams, 2 Anstr. 344; S. C. 2 Fowl. Exch. Pra. 268, 272.

 Anonymous, 2 Ves. jun. 336.

 Lansdown v. Elderton, 14 Ves. 512; Ex parte Cranmer, 2 Collinson on Idiots, 705.

 It is true, that the law sometimes sleeps, and judgment wakens-it ;, for, dormii aligpanio lex moritur nuntpiam. — Maty Porteugton?scase, 10 Co. 42;

 Simpson v. Hammond, per Kilty, Chancellor.

 Bolte v. Biays,, 15th March; 1821, per Kilty, Chancellor.

 Ringgold v. Jones, 1 Bland, 89, note.

 2 Mad. Chan. 474; 1 Newl. Chan. Pra. 350.

 Ex parte Cranmer, 2 Collinson on Idiots, 705.

 Brown v. Chapman, 3 Burr. 1418; Ex parte Gayter, 1 Atk. 144; Holmes v. Wainewright, 1 Swan. 23.

 The United States v. Lyman, 1 Mason, 482.

 Davies v. Cracraft, 14 Ves. 143; Musgrave v. Medex, 1 Meriv. 49 ; Utten v. Utten, 1 Meriv. 51.

 Wright v. Freeman, 5 H. & J. 475; The Mayor of Baltimore v. Howard, 6 H. & J. 394.—

 Spurrier v. Spurrier, 1 Bland, 476, note; Ex parte Boone, ante 321, note; McMullen v. Burris, ante 357, note; Christie v. Hammond, ante 645, note; 1785, eh. 72, s. 9.

 Collinridge v. Mount, 2 Dick. 688; Musgrave v. Medex, 1 Meriv. 49.

 Mackreth v. Symmons, 15 Ves. 329; Cowell v. Simpson, 16 Ves. 276.

 Haig v. Commissioners of Confiscated Estates, 1 Desau. 144.

 This opinion of the Court of Appeals is introduced here, out of chronological order, that itmay lie placed in juxta-position to the decision of the Chancellor, to which it relates.

g) Ellicott v. Welch, ante 244; Hammond v. Hammond, ante 344.

 Colegate D. Owings’ case, 1 Bland, 409.

 1825, ch. 122.

 Meluy v. Cooper, ante 199, note ; Purnell v. Comegys, 1806, per Kilty, Chancellor; Bailie v. Harrison, 1806, per Kilty, Chancellor; Moreton v.Harrison, 1 Bland, 491; Iglehart v. Armiger, 1 Bland, 519.

 Ante 655.

 Holmes v. Wainewright, 1 Swan. 23; Cotterel v. Hooke, 1 Doug. 97.

 Smart v. Wolff, 3 T. R. 342.

 Smith v. Woodcock, 4 T. R. 691.

 Morrice v. The Bank, Cas. Tem. Tal. 222; Martin v. Kerridge, 3 P. Will. 240.

 Powel Mortg. 204, 966; Toplis v. Baker, 2 Cox, 123.

 Goodman v. Grierson, 2 Ball & Bea. 279; Davis v. Battine, 6 Cond. Cha. Rep. 404.

 Powell Mortg. 15, note L.; Tooke v. Hartley, 2 Bro. C. C. 126; S. C. 2 Dick, 785; Perry v. Barker, 8 Ves. 527; S. C. 13 Ves. 196; Greenwood v. Taylor, 4 Cond. Cha. Rep. 381.

 1785, ch. 72, s. 1, 2 & 3; 1837, ch. 292.

 Atkinson v. Hall, ante 371, note.
Wardrop v. Hall. — This bill was filed on the 21st of November, 1748, by John Wardrop against Joseph Hall, to foreclose a mortgage on a tract of land, which the defendant had given to the plaintiff to secure the payment of three hundred pounds sterling, with interest. The defendant by his answer admitted the mortgage, and that no part of the principal or interest of the debt had been paid; but alleged that the mortgaged land was an ample security for the debt, the improvement thereon alone being worth, at a moderate valuation, at least six hundred pounds sterling; and therefore he prayed to be allowed a reasonable time to redeem, &c.
May, 1749. — Ogle, Chancellor. — It appearing to this court that a sum of three hundred pounds sterling was, on the 17th day of October, 1747, lent and advanced by the complainant to the defendant on the said mortgaged premises, as a security for the repayment of the said sum, with the interest thereof. It is therefore Decreed, that in case the defendant doth not, on or before the 30th day of September next, pay unto the complainant the said sum of three hundred pounds sterling, with lawfui *667 interest for the same, as also the costs expended by the complainant in this suit, the said defendant, and all claiming by, from, or under him, shall be for ever, and they are hereby from thenceforth debarred and foreclosed of all manner of equity of redemption or reclaim in and to the said mortgaged premises; and that the said complainant have an absolute estate in the same, free from all redemption and equity and power of redemption of, in, or by the said defendant, his heirs or assigns, or any person or persons claiming by or under them.— Chancery Proceedings, lib. J. E. No. 5, fol. 513. _
Hunter v. Gaunt. — This bill was filed by Adam Hunter, heir at law and devisee of James Hunter, late of the state of Virginia, deceased, and Robert Purviance and Samuel Purviance, of Baltimore county, administrators with the will annexed of the said J ames Hunter, against Fielder Gaunt, of Frederick county, to foreclose a mortgage. The defendant answered, and the case was brought before the court.
27th February, 1790. — Hanson, Chancellor. — This cause standing for hearing, and the court having duly considered the bill, answer, proofs, and exhibits therein; it is Decreed, that the said defendant do and shall pay and satisfy to the complainants, Adam Hunter and Robert Purviance, the surviving administrator of the said James Hunter, the sum of £6,294 Is. Id. current money, with interest from the 13th of December, 1769, together with all costs by the complainants in this suit expended before the 13th day of October next ensuing; or that the defendant pay to the complainants aforesaid, on the said 13th day of October, between the hours of 10 and 12 in the forenoon of the same day, at the chancery office in the city of Annapolis, the sum of £ 14,161 12s. id. current money, being adjudged and decreed by this court to become due on the said day, for the principal and interest on the mortgage in the complainant’s bill mentioned; that is to say, the sum of £6,294 Is. Id. current .money being adjudged and decreed to be due for the principal of the said mortgage, on the 13th day of December, in the year of our Lord 1769; and the sum of £7,867 11s. 3d. current money being adjudged and decreed to become due for the interest of the said mortgage on the said 13th day of October, in the year of our Lord 1790, if the principal and interest be not before paid; and upon payment of the principal sum of £6,294 Is. Id. with interest as aforesaid, or of the sum of £14,161 12s. id. current money, and costs of suit aforesaid, on the said 13th day of October in the present year as aforesaid, the said Adam Hunter and Robert Purviance, their heirs or assigns, shall make and execute to the said defendant a good and sufficient release, in fee simple, of the said mortgaged premises and every part thereof.
And it is further Decreed, that if the said Fielder Gaunt, the defendant, shall fail or neglect to pay and satisfy unto the said Adam Hunter and Robert Purviance the sum of principal money and interest hereby decreed, and the costs of suit, on or before the said 13th day of October as aforesaid, that then from and immediately after the said 13th day of October, in the said year of our Lord 1790, the said defendant, his heirs, executors, administrators, and assigns, shall be for ever and they are hereby from thenceforth debarred and foreclosed of and from all manner of equity of redemption or reclaim in or to the said mortgaged premises in the bill mentioned, and every part and parcel thereof; and that the said Adam Hunter, the complainant, shall and may retain the same to him and his heirs, absolutely and fully discharged from the said Fielder Gaunt, his heirs and assigns forever.
Buchanan v. Shannon. — 17th March, 1800. — Hanson, Chancellor. — The said *668 cause standing ready for hearing, the bill, exhibits, and all other proceedings, were by the Chancellor read and considered. It is thereupon Decreed, that the bill of the complainant, George Buchanan, against Michael Shannon, the defendant, be taken pro confesso; and that unless the defendant, Michael Shannon, shall on the 1st day of October next bring into this court, to be paid to the complainant, the sum of £252 10s. 6d. current money, which will be the sum on that day due for principal and interest on the mortgage in the bill mentioned; or at any time before the said day shall bring into this court, to be paid to the complainant as aforesaid; or pay to the complainant the sum of £170 12s. 6d. current Bioney, with interest from the 1st day of October, 1792, until the time of bringing in or actual payment, he shall for ever be barred or foreclosed from all redemption or équity of redemption of the lot in the bill and mortgage mentioned ; and the complainant, his heirs and assigns, shall be entitled to hold the same free, clear, and discharged from all claim of the said defendant. Provided always, that if the said absent defendant, his heirs, devisees, or representatives, shall appear in the Chancery Court at any time within eighteen calendar months from the date of the decree, viz. before the 18th day of September, 1801, and require a review of this decree, the Chancellor, upon bill filed by the said defendant, or his heirs, devisees, or representatives, shall proceed to an examination of the matters in dispute, and to a final decree, in the same manner as if the said defendant had originally appeared before him. — [1795, ch. 88, s. 1.]

 Powel Mortg. 15, note L; Wood v. Fulton, 2 H. & G. 72.

 1784, ch, 58.

 Wood v. Fulton, 2 H. & G. 72.

 Ex parte Hunter, 6 Ves. 94.

 Karthaus v. Owings, 6 H. & J. 134; Wood v. Fulton, 2 H. & G. 72.

 1825, ch. 122, ante 663.

 Davis v. Battine, 6 Cond. Cha. Rep. 404.

 Bealmere v. Warfield, 1st October, 1830, per Bland, Chancellor, a similar application to open the biddings, was rejected.